Filed 6/27/16  The Word for Today, Inc. v. Calvary Chapel of Costa Mesa CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE WORD FOR TODAY, INC., | |
| Plaintiff and Respondent, | G052514 |
| v. | (Super. Ct. No. 30-2014-00747427) |
| CALVARY CHAPEL OF COSTA MESA et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an order of the Superior Court of Orange County, Kirk H. Nakamura, Judge.  Affirmed.

Meyers Fozi, Golnar J. Fozi, Jeremy M. Dwork and Daniel S. Modafferi for Defendants and Appellants.

Allred, Maroko & Goldberg, Nathan Goldberg, Michael Maroko, John Steven West; and Jefferey B. Lurner for Plaintiffs and Respondents.

\*          \*          \*

To invoke the anti-SLAPP statute (Code Civ. Proc., § 425.16),[1] a defendant bears the initial burden to show the plaintiff's claims arise from the defendant's constitutionally-protected free speech or petitioning activities. To assess whether a claim arises from protected activity, courts must examine the principal thrust or gravamen of the claim and identify the specific act the plaintiff alleges as the basis for the claim. Collateral or incidental allusions to protected activity do not trigger the anti-SLAPP statute, nor does the statute apply merely because a claim followed or was triggered by the defendant's free speech or petitioning activities. The claim itself must be based on an act in furtherance of the defendant's free speech or petitioning rights for the statute to apply.

In this action, defendant and appellant Calvary Chapel of Costa Mesa (Calvary Chapel)[2] sought to strike the complaint of plaintiff and respondent The Word for Today, Inc. (Word for Today) under the anti-SLAPP statute. Calvary Chapel argued Word for Today's claims arose from Calvary Chapel's protected speech activity in broadcasting recorded religious sermons and messages by Charles W. Smith (Pastor Chuck). The trial court denied the motion, finding Calvary Chapel failed to show the claims arose from protected activity because they were based on an ownership dispute between Word for Today and Calvary Chapel concerning Pastor Chuck's recorded sermons, writings, and other religious materials, not Calvary Chapel's broadcast of the sermons.

---

[1]   All statutory references are to the Code of Civil Procedure.

[2]   The following individuals, who are officers and directors of Calvary Chapel, also are defendants and appellants in this action: Brian Brodersen, Michael Mugavero, Roger Wing, David Eason, Joe Dyer, Doug Finlayson, Phil Twente, Bob Wolf, John Jackson, and Laura Jackson. We refer to all defendants and appellants collectively as Calvary Chapel.

2

We affirm. Word for Today's complaint does not base its claims on Calvary Chapel's broadcast of Pastor Chuck's sermons. Instead, Word for Today bases its claims on the allegations that (1) Pastor Chuck formed Word for Today to own and control the dissemination of his sermons, writings, and religious materials; (2) Pastor Chuck, Word for Today, and Calvary Chapel agreed in writing that Calvary Chapel could use the materials during Pastor Chuck's lifetime, but beneficial ownership at all times remained with Word for Today and Word for Today had the exclusive right to those materials upon Pastor Chuck's death; (3) the materials generated substantial revenue for both Word for Today and Calvary Chapel through the donations they inspired and their sales; (4) when Pastor Chuck died, Calvary Chapel seized control of Pastor Chuck's religious materials and Word for Today's office, including the post office box and toll-free telephone number Word for Today had used for more than 20 years to receive donations and orders for Pastor Chuck's materials; and (5) Calvary Chapel essentially put Word for Today out of business by refusing to provide it access to Pastor Chuck's religious materials, failing to pay for its sale and use of those materials, and holding itself out to the public as the owner of the materials. Calvary Chapel made no showing any of these or the other actions alleged as the basis for Word for Today's claims constitute protected free speech or petitioning activities.

I

FACTS AND PROCEDURAL HISTORY

Pastor Chuck devoted his entire adult life to religious teachings. Starting in the 1950's, he served as the pastor for several churches, had his own radio show to broadcast his sermons and religious messages, and authored many books and other religious materials. He originally licensed all materials he produced to the Maranatha Evangelical Association.

3

In 1965, Calvary Chapel hired Pastor Chuck as its senior pastor. During his 48-year tenure with Calvary Chapel, Pastor Chuck produced an enormous amount of religious materials, including countless sermons and pastoral messages he delivered to the Calvary Chapel congregation, at religious conferences, and at various events around the world. He also produced numerous pamphlets, notes and outlines, videos, a study Bible and other religious study materials, religious commentaries, and various documentaries about his life, his ministries, his teachings, and other religious topics.

In approximately 1978, Pastor Chuck began broadcasting his recorded sermons on a daily radio program entitled, "The Word for Today," which aired on a radio station Calvary Chapel owned. At about the same time, Pastor Chuck and his brother formed Word for Today to own, disseminate, and control all his religious materials. To further that purpose, Pastor Chuck had Maranatha Evangelical Association transfer to Word for Today all its rights to the religious materials Pastor Chuck previously had produced.

Calvary Chapel reaped the benefits of Pastor Chuck's growing popularity. The substantial revenue his religious materials and teachings generated allowed both Word for Today and Calvary Chapel to carry out their pastoral missions, and also spurred Calvary Chapel's enormous growth. For most of his time with Calvary Chapel, Pastor Chuck served both as Calvary Chapel's senior pastor and the head of Word for Today. Although they were separate entities, the two organizations shared employees, operated out of a single facility owned by Calvary Chapel, and often commingled their assets. Occasionally, Calvary Chapel would pay Word for Today royalties for using Pastor Chuck's religious materials.

As part of this cooperative working relationship, Pastor Chuck and Word for Today agreed to allow Calvary Chapel to have access to and use his religious materials during his lifetime. In exchange, Calvary Chapel agreed that Word for Today beneficially owned all rights and interests in Pastor Chuck's religious materials, Word for

4

Today would have the exclusive right to control and disseminate the materials upon Pastor Chuck's death, and Calvary Chapel would pay Word for Today for using Pastor Chuck's religious materials. Calvary Chapel, Word for Today, and Pastor Chuck confirmed his agreement in a signed resolution Calvary Chapel's board of directors passed and ratified in 1998.

Although he suffered a stroke and battled lung cancer, Pastor Chuck continued to serve as Calvary Chapel's senior pastor and to produce new religious materials until his death in October 2013. Upon Pastor Chuck's death, Word for Today alleges Calvary Chapel immediately "commandeered Pastor Chuck's office, personal computers, hard drives, files, and records" and "took control over the office, files, records, and other property of [Word for Today]." Despite its repeated demands and the foregoing agreement, Calvary Chapel refused to allow Word for Today access to any of Pastor Chuck's recorded sermons, writings, or other religious materials that were kept in the facilities Word for Today shared with Calvary Chapel. According to Word for Today, Calvary Chapel also seized control of the post office box and toll-free telephone number Word for Today had used for more than 20 years to receive donations and orders for Pastor Chuck's religious materials, and Calvary Chapel has represented to the public it owns Pastor Chuck's religious materials and all donations and orders should be directed to it. Word for Today alleges Calvary Chapel essentially forced it out of business by denying it access to its own database of donors and supporters, depriving it of access to the property needed to fill orders for Pastor Chuck's religious materials, and failing to pay the royalties its owes for using those materials.

Word for Today filed this action against Calvary Chapel and its officers and directors in 2014. The operative first amended complaint alleges claims for constructive trust, fraud, accounting, unfair business practices, conversion, breach of fiduciary duty,

5

and injunctive relief based on the foregoing conduct.[3]  Word for Today seeks monetary damages, an order that Calvary Chapel holds all donations, sales, and other revenue generated by Pastor Chuck's religious materials as a constructive trustee for Word for Today's benefit, an accounting, and an injunction enjoining Calvary Chapel from engaging in the unfair and fraudulent business practices described above.

Calvary Chapel filed a special motion to strike Word for Today's entire complaint under the anti-SLAPP statute, arguing its claims arose from its protected conduct in broadcasting Pastor Chuck's sermons.  The trial court denied the motion, finding Calvary Chapel failed to meet its burden to show Word for Today's causes of action were based on protected speech.  The court explained, "The gravamen of the causes of action asserted by [Word for Today] are based on a dispute over ownership of intellectual property and right to royalties therefrom, which is similar to the property dispute in . . . *In re Episcopal Church Cases* (2009) 45 Cal.4th 467, 477 to 478.  See also, *Martinez v. Metabolife International, Inc.* (2003) 113 Cal.App.4th 181, 192 to 193 as to claims 'arising from' protected speech."  This appeal followed.

II

DISCUSSION

A.    *Fundamental Anti-SLAPP Principles*

"'A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the

---

[3]    The operative complaint also alleges claims for elder financial abuse and constructive trust on behalf of Pastor Chuck's wife, Catheryn Smith.  These claims allege Calvary Chapel agreed to purchase a life insurance policy on Pastor Chuck's life and name his wife as the beneficiary.  Calvary allegedly did so, but then later changed the policy to designate itself as the beneficiary.  Calvary Chapel's special motion to strike also challenged these causes of action.  The trial court denied that aspect of the motion and Calvary Chapel does not challenge that ruling on appeal.

6

government for redress of grievances.  [Citation.]  The Legislature enacted . . . section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights.'"  (*Collier v. Harris* (2015) 240 Cal.App.4th 41, 49 (*Collier*).)  Under section 425.16, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)

"'To determine whether a lawsuit or cause of action should be disposed of as a SLAPP suit, section 425.16 establishes a two-part test.  Under the first part, the party bringing the anti-SLAPP motion has the initial burden of showing that the lawsuit, or a cause of action in the lawsuit, arises from an act in furtherance of the right of free speech or petition—i.e., that it arises from a protected activity.  [Citation.]  Once the defendant has met its burden, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the lawsuit or on the cause of action.  [Citation.]  Only a cause of action that satisfies both parts of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning and lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.'"  (*Collier*, *supra*, 240 Cal.App.4th at pp. 49-50.)

"A defendant meets his or her burden on the first step of the anti-SLAPP analysis by demonstrating the acts underlying the plaintiff's cause of action fall within one of the four categories spelled out in section 425.16, subdivision (e)."  (*Collier*, *supra*, 240 Cal.App.4th at pp. 50-51.)  That subdivision defines the statutory phrase "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue'" to include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or

7

writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

"'We review de novo the court's order granting [or denying a] section 425.16 special motion to strike. [Citation.] "We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' [Citation.] However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.'"'" (*Collier*, *supra*, 240 Cal.App.4th at p. 50.) "If the trial court's decision denying an anti-SLAPP motion is correct on any theory applicable to the case, we may affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1307 (*City of Alhambra*).)

B.     *Calvary Chapel Failed to Show Word for Today's Claims Arose From Protected Speech Activities*

Calvary Chapel contends the trial court erred because Word for Today's claims arose from Calvary Chapel's radio broadcasts of Pastor Chuck's recorded sermons, and those broadcasts are protected speech activity. Calvary Chapel focuses on establishing its broadcasts of the sermons were protected activity, but it fails to point to any allegations in the complaint or other evidence showing Word for Today's claims were based on those broadcasts. The complaint's plain allegations establish Word for Today's claims do not arise from those broadcasts, and therefore the trial court properly denied the motion.

8

"[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 (*City of Cotati*).) "'In assessing whether a cause of action arises from protected activity, "'we disregard the labeling of the claim [citation] and instead "examine the *principal thrust* or *gravamen* of a plaintiff's cause of action."'"'" (*Collier*, *supra*, 240 Cal.App.4th at p. 50.) "The 'meaning of "gravamen" is clear; "gravamen" means the "material part of a grievance, charge, etc."'" (*Renewable Resources Coalition, Inc. v. Pebble Mines Corp.* (2013) 218 Cal.App.4th 384, 396 (*Renewable Resources*).)

"We assess the principal thrust [or gravamen] by identifying '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim.'" (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272 (*Hylton*).) "'In deciding whether an action is a SLAPP, the trial court should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity.'" (*City of Alhambra*, *supra*, 193 Cal.App.4th at p. 1307; see *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537 ["A claim 'arises from' an act when the act '"'forms the basis for the plaintiff's cause of action'"'"].) "If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute." (*Hylton*, at p. 1272.)

"[This] 'arising from' requirement is not always easily met." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66.) "[T]he mere fact an action was filed after protected activity took place does not mean it arose from that

9

activity.  The anti-SLAPP statute cannot be read to mean that 'any claim asserted in an action which arguably was filed in retaliation for the exercise of speech or petition rights falls under section 425.16, whether or not the claim is *based on* conduct in exercise of those rights.'  [Citations.]  [¶]  . . .  California courts rightly have rejected the notion 'that a lawsuit is adequately shown to be one "arising from" an act in furtherance of the rights of petition or free speech as long as suit was brought after the defendant engaged in such an act, whether or not the purported basis for the suit is that act itself.'"  (*City of Cotati*, *supra*, 29 Cal.4th at pp. 76-77.)

"[A] plaintiff cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a garden variety tort or contract claim when in fact the claim is predicated on protected speech or petitioning activity." (*Hylton*, *supra*, 177 Cal.App.4th at pp. 1271-1272.)  At the same time, "'a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant.'" (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 822.)  "Accordingly, we focus on the specific nature of the challenged protected conduct, rather than generalities that might be abstracted from it" (*Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1279), and we "independently determine[] what acts form the basis for plaintiffs' claims" (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143).

Numerous cases demonstrate the need for courts to carefully distinguish between conduct that forms the basis for the plaintiff's claims and allegations of protected activity that merely provide background or serve as evidence to support the plaintiff's claims. (See, e.g., *Episcopal Church Cases* (2009) 45 Cal.4th 467 (*Episcopal Church*); *Renewable Resources*, *supra*, 218 Cal.App.4th 384; *Hylton*, *supra*, 177 Cal.App.4th 1264.)  In *Episcopal Church*, a local parish broke away from the general Episcopal Church based on a dispute over church doctrine.  In doing so, the parish

10

asserted it owned the buildings and real property where its members worshipped.  The Episcopal Church's local diocese responded by filing a lawsuit against the parish, asserting it owned that same property.  (*Episcopal Church*, at pp. 475-476.)  The parish moved to strike the complaint under the anti-SLAPP statute, arguing the diocese's claims "arose from [the parish's] protected activity in first expressing disagreement with the higher church authorities regarding church governance and then disaffiliating from the general church."  The trial court agreed and granted the motion.  (*Episcopal Church*, at p. 477.)

The Supreme Court reversed, explaining the local diocese brought the action "to resolve a *property dispute*.  The property dispute is based on the fact that both sides claim ownership of the same property.  This dispute, and not any protected activity, is 'the gravamen or principal thrust' of the action.  [Citation.]  The additional fact that protected activity may lurk in the background—and may explain why the rift between the parties arose in the first place—does not transform a property dispute into a SLAPP suit.  Accordingly, the trial court erred in treating this as a SLAPP suit subject to section 425.16's special motion to dismiss."  (*Episcopal Church*, *supra*, 45 Cal.4th at pp. 477-478.)

In *Renewable Resources*, the plaintiff was a nonprofit environmental coalition that opposed a proposed mine in Alaska and hired a political fundraiser to help support a state ballot initiative to prevent the mine's development.  After the measure's defeat, the mine's developer paid the fundraiser $50,000 to reveal its confidential communications with the plaintiff about the initiative.  The developer then used those communications to file a complaint with the Alaska Public Offices Commission (APOC), alleging the plaintiff violated state election laws in supporting the initiative.  The plaintiff successfully defended the administrative complaint, and then filed a lawsuit against the developer for interference with the contract between the plaintiff and the fundraiser, and for interference with prospective economic advantage.  The plaintiff sought to recover the

11

substantial fees and costs it incurred in defending against the administrative complaint and the donations it lost based on the negative publicity associated with that complaint. (*Renewable Resources*, *supra*, 218 Cal.App.4th at pp. 388-390.)

The developer brought an anti-SLAPP motion to strike the plaintiff's complaint, contending the claims arose from the developer's protected petitioning activity in filing the administrative complaint with the APOC. In granting the motion, the trial court found the plaintiff's damages allegations regarding the fees it incurred in defending the administrative complaint showed the plaintiff sued the developer for filing the administrative complaint and not for inducing the fundraiser to sell the plaintiff's confidential documents. (*Renewable Resources*, *supra*, 218 Cal.App.4th at pp. 390-392.) The Court of Appeal reversed, explaining the trial court erroneously relied on the plaintiff's damages allegations instead of "the 'allegedly wrongful and injury-producing conduct' [citation] which gave rise to the [plaintiff's] damages." (*Id.* at p. 396.) Although the developer argued its administrative complaint was protected speech or petitioning activity that triggered the anti-SLAPP statute, the Court of Appeal concluded the plaintiff's pleading established the gravamen of the claims concerned the act of inducing the fundraiser to sell the plaintiff's confidential documents, which was not speech or petitioning activity protected by the anti-SLAPP statute. (*Renewable Resources*, at pp. 397-398.)

Finally, *Hylton* involved a fee dispute between a client and the attorney he hired to bring a wrongful termination lawsuit against the client's former employer. After entering into a contingency fee agreement requiring the client to pay the attorney one-third of any recovery, the attorney filed a lawsuit against the employer on the client's behalf and induced the client to include a claim to confirm the client's right to various stock options he held as one of his former employer's founders. Later, the attorney advised the client to settle the lawsuit or risk losing all of his stock options. Based on that settlement, the attorney received one-third of the client's stock options worth more

than $6 million. The client then sued the attorney for declaratory relief and to rescind the contingency fee agreement, claiming the attorney breached his fiduciary duties to the client by charging an unconscionable fee and inducing the client to include a claim regarding the stock options when the former employer did not dispute the client's right to those options. (*Hylton*, *supra*, 177 Cal.App.4th at pp. 1267-1269.)

The attorney brought an anti-SLAPP motion, arguing the client's claims arose from the attorney's protected petitioning activities in filing and prosecuting the earlier lawsuit on the client's behalf. (*Hylton*, *supra*, 177 Cal.App.4th at pp. 1269-1270.) The trial court denied the motion and the Court of Appeal affirmed: "Although petitioning activity is part of the evidentiary landscape within which [the client's] claims arose, the gravamen of [the client's] claims is that [the attorney] engaged in nonpetitioning activity inconsistent with his fiduciary obligations owed to [the client]: [The attorney] falsely advised [the client] there was some doubt about [the client's] entitlement to the . . . stock, [the attorney] concocted and carried out a scheme to manipulate his representation of [the client] in a manner to justify extracting an excessive fee, and he falsely advised [the client] that he could lose all of his stock to induce [the client] to consent to an agreement that transferred $6 million in . . . stock to [the attorney]." (*Id*. at p. 1272.)

Here, the injury-producing conduct Word for Today alleged in its complaint centered on Calvary Chapel's seizure of Word for Today's property upon Pastor Chuck's death and that it denied Word for Today access to that property, including Pastor Chuck's religious materials, the post office box and toll-free phone number Word for Today had used for more than 20 years to receive donations and orders, and its computer database identifying all of its donors and supporters. The gravamen or principal thrust of Word for Today's claims is that Calvary Chapel put Word for Today out of business by denying Word for Today access to the materials it requires to conduct its business and by failing to pay Word for Today for Calvary Chapel's use of those

13

materials as the parties' agreement required. None of these acts qualifies as protected speech under the anti-SLAPP statute.

Although Calvary Chapel contends Word for Today based its claims on the broadcast of Pastor Chuck's sermons, the plain allegations of Word for Today's complaint simply do not support this assertion. Calvary Chapel fails to cite any specific allegation in the complaint or other evidence that supports its contention. The complaint's few references to broadcasting the sermons simply provide background information and evidence of Calvary Chapel's claim that it owns all of Pastor Chuck's religious materials. For example, the complaint includes several references to the broadcast of Pastor Chuck's sermons during his lifetime to show how those broadcasts created a market for Pastor Chuck's religious materials and helped Calvary Chapel to grow into the large church it is today. Similarly, to show Calvary Chapel is representing to the public it is the owner of Pastor Chuck's religious materials, the complaint includes allegations showing Calvary Chapel edited the recorded sermons after Pastor Chuck's death to claim it sponsored the sermons rather than Word for Today. Word for Today does not claim these allegations form the basis for imposing liability on Calvary Chapel, and therefore they do not trigger the anti-SLAPP statute.

Calvary Chapel spills considerable ink arguing its broadcasts of Pastor Chuck's sermons qualify as protected speech because radio broadcasts occur in a public forum and Pastor Chuck's sermons are a matter of public interest. Calvary Chapel also spends considerable time arguing Word for Today's allegations that Calvary Chapel committed theft or stole the recorded sermons does not prevent Calvary Chapel from claiming the anti-SLAPP statute's protections for its broadcasts of the sermons. According to Calvary Chapel, any alleged illegality associated with the broadcasts are reserved for the second stage of the analysis under the anti-SLAPP statute, but has no bearing on Calvary Chapel's burden to show the claims arose from protected activities

during the first stage of the analysis.[4]  (See *Collier*, *supra*, 240 Cal.App.4th at p. 54 ["'[A]ny "claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case"'"].)

We need not address the merits of these contentions because they are irrelevant to our analysis of whether Calvary Chapel satisfied its burden to show Word for Today's claims arose from protected speech activity.  Each of these contentions assumes Word for Today's claims are based on Calvary Chapel's broadcasts of Pastor Chuck's sermons.  As explained above, Word for Today's claims are not based on Calvary Chapel's broadcast of the sermons, and therefore whether the broadcasts constitute protected speech activity and whether the alleged theft of the recorded sermons

---

[4]    In a related argument, Calvary Chapel contends intellectual property such as Word for Today's copyright in the sermons cannot be "'stolen'" like tangible property. According to Calvary Chapel, copyrights are infringed by the unauthorized act of reproducing or displaying the copyrighted material, but there can be no "'theft'" or conversion because an infringer does not take control of the copyrighted material, but rather simply uses it.  Calvary Chapel, however, fails to explain how this argument has any bearing on the question whether it met its burden in the first stage of the anti-SLAPP analysis.  As Calvary Chapel argues, any alleged illegality of the underlying conduct is considered in the second stage of the analysis, not the first.  The first stage merely examines whether the alleged conduct is protected speech or petitioning activity; it is not concerned with whether the plaintiff can state or prove a legally cognizable claim.

This argument also fails because Calvary Chapel again ignores the allegations on which Word for Today bases its claims.  Word for Today does not simply allege Calvary Chapel used the recorded sermons without Word for Today's authorization.  Instead, Word for Today alleges Calvary Chapel seized the master and all other recordings of the sermons along with all of Pastor Chuck's other religious materials, and Calvary Chapel continues to deny Word for Today access to all of those materials.  Even the case authorities Calvary Chapel cites recognize a conversion of copyrighted materials occurs when the alleged converter takes the original or hard copy versions and prevents the copyright holder from accessing the copyrighted material.  (See, e.g., *Maheu v. CBS, Inc.* (1988) 201 Cal.App.3d 662, 671-673.)

prevents Calvary Chapel from claiming the anti-SLAPP statute's protection for those broadcasts do not impact our analysis.

The trial court properly denied the anti-SLAPP motion on the ground Calvary Chapel failed to meet its burden to show Word for Today's claims arose from protected speech activity. Accordingly, the anti-SLAPP statute does not apply and we need not address whether Word for Today met its burden to show a probability of prevailing on the lawsuit. (*Hylton*, *supra*, 177 Cal.App.4th at p. 1271.)

## III

### DISPOSITION

The order is affirmed. Word for Today shall recover its costs on appeal.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.